# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANOVA APPLIED ELECTRONICS, INC., | |
| Plaintiff, | Civil Action No. 17-12291-FDS |
| v. | |
| HONG KING GROUP, LTD., HONG KING ELECRIC APPLIANCE CO. LTD, SHENZHEN GOODLY ELECTRONIC CO. LTD., SHINNING INDUSTRIES, LTD., SUNBIRD TECHNOLOGY DEVELOPMENT CO. LTD., HIFAST INDUSTRIAL CO. LTD., NINGBO YANGFAR INDUSTRY CO., LTD., NICHE CONCEPTS LTD., COBESI (DG) ELECTRONICS CO., LTD., and WANCLE CORPORATION, | |
| Defendant. | |

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SERVICE OF PROCESS VIA E-MAIL PURSUANT TO FED. R. CIV. P. 4(f)(3)

**SAYLOR, C.J.**

This is an action for trademark and trade dress infringement. Plaintiff Anova Applied Electronics, Inc. is a Delaware corporation that manufactures and sells kitchen appliances. Defendants are several companies located in China. Anova alleges that defendants have infringed on the trademark and trade dress of its product, the Sous Vide Precision Cooker.

Anova has repeatedly attempted to serve process on defendants through the Ministry of Justice in China, the primary means of service set forth by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. But after nearly two years, the Ministry has yet to serve defendants or even provide an estimate as to when it expects to do so. Anova has now

moved for an order by this Court that authorizes it under Fed. R. Civ. P. 4(f)(3) to serve defendants by e-mail.

The question presented here is not whether service by e-mail is an expedient and cost-effective method of providing actual notice to a defendant of the existence of a lawsuit. Obviously, it is. Rather, it is whether such service is permitted under the relevant federal rule (Fed. R. Civ. P. 4(f)(3)) and international treaty (the Hague Convention). Whether Rule 4(f)(3) permits service of process by e-mail on a country that, like China, has objected to certain provisions of the Hague Convention is a difficult question on which many courts have disagreed. While the answer is certainly open to doubt, this Court concludes that Rule 4(f)(3) does not permit e-mail service under such circumstances. Accordingly, and for the reasons set forth below, the motion will be denied.

I.  **Background**

 A.  **Factual Background**

The facts are set forth as alleged by plaintiff in the complaint.

Anova Applied Electronics, Inc. is a "smart kitchen appliance company" incorporated under the laws of Delaware and with a principal place of business in California. (Compl. ¶¶ 12, 22). It manufactures and sells a variety of home appliances that are connected to the internet in some way. (*See id.*).

Defendants are companies organized and existing under the laws of China and with their principal places of business in various cities in China. (*Id.* ¶¶ 13-21).[1]

One of Anova's products is its Sous Vide Precision Cooker. (*Id.* ¶ 23). The Precision Cooker is a constant temperature immersion circulator. (*Id.*). That means that it cooks food in

---

[1] Niche Concepts is a Hong Kong company but was voluntarily dismissed by plaintiff. (*See* Dkt. No. 41).

pouches that have been immersed in water by heating the water to a chosen temperature, maintaining that temperature, and constantly circulating the water around the food pouch. (*See id.*).

Anova holds a trademark registration, No. 4,989,116, for the name PRECISION in connection with constant temperature immersion circulators. (*Id.* ¶ 26). The complaint also alleges that Anova enjoys trade dress protection for the design of the Sous Vide Precision Cooker because its design is distinctive, non-functional, and used continuously. (*Id.* ¶¶ 27-28).

Defendants allegedly sell several different constant temperature immersion circulators that use the PRECISION mark as well as the Precision Cooker's distinctive trade dress. (*Id.* ¶¶ 37-40). They allegedly sell and advertise those products to a variety of customers who then re-sell them in the United States. (*Id.* ¶ 38). The complaint alleges that defendants knew or should have known that these customers were marketing and selling the allegedly infringing products in the United States. (*Id.*).

### B. Procedural Background

On November 20, 2017, Anova filed this action. The complaint asserts 25 counts. It alleges that defendants violated federal and Massachusetts trademark laws as well as Massachusetts laws that prohibit unfair competition. (*Id.* ¶¶ 41-187).

That same day, Anova sent copies of the complaint and its motion for a temporary restraining order to several e-mail addresses. (Ercolini Decl. (Dkt. No. 39) Ex. A). Anova obtained the e-mail addresses from defendants' websites and their listings on e-commerce sites where they sell the accused products. (*See* Ercolini Decl. ¶ 4; *id.* Ex. B).

In November and December 2017, Anova received responses from several of these e-mail addresses. (Ercolini Decl. ¶ 5; *id.* Ex. C). At least one of those e-mail responses indicated that the sender was affiliated with the defendant company. (Ercolini Decl. Ex. C, at 1, 4, 7).

Meanwhile, Anova tried to serve defendants with physical copies of the complaint and summons. It hired Nelson Tucker, a professional process server who is familiar with the requirements for service of process in China. (Tucker Decl. ¶ 1).

On February 7, 2018, Tucker submitted a formal service request on Anova's behalf to the Ministry of Justice, which is the central authority for service of process designated by China. (*Id.* ¶ 2). That service request included all court-issued documents in both English and translated into Mandarin Chinese. (*Id.*).

In September 2018, the Ministry of Justice returned Anova's service request unserved. (*Id.* ¶ 4). It did so because, due to a change in policy, the Ministry no longer accepted cashier's checks to pay related fees and instead required payment by a bank wire transfer. (*Id.*).

In October 2018, Anova submitted a new service request to the Ministry and paid the fees by bank wire transfer in accordance with the Ministry's new policy. (Ercolini Decl. ¶ 6).

On August 23, 2019, Tucker's agent in China visited the Ministry to check on the status of the service request. (Tucker Decl. ¶ 6). He was told that the services were still being processed by local courts and that a time estimate for their completion was not available. (*Id.*).

On December 6, 2019, Anova filed the present motion, which requests authorization under Fed. R. Civ. P. 4(f)(3) to serve defendants with the complaint and summons by e-mail.

**II.      Legal Standard**

Rule 4 sets forth the acceptable methods for service of process. "Unless federal law provides otherwise," a corporation that is to be served "at a place not within any judicial district of the United States" must be served "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." Fed. R. Civ. P. 4(h)(2).

Rule 4(f) in turn provides that, unless federal law requires otherwise, "an individual . . . may be served at a place not within any judicial district of the United States:"

(1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice . . .

(3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).

## III. Analysis

### A. Whether Plaintiff Has Attempted Service Under Rule 4(f)(1)

A threshold question is whether a plaintiff must attempt service under Rule 4(f)(1) before it resorts to court-ordered service under Rule 4(f)(3). At least one federal court of appeals has held that it need not. *Rio Props., Inc. v. Rio Intern'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002) ("[S]ervice of process under Rule 4(f)(3) is neither a 'last resort' nor 'extraordinary relief.'"); *see also Advanced Aerofoil Techs., AG v. Todaro*, 2012 WL 299959, at *1 (S.D.N.Y. Jan. 31, 2012). The First Circuit, however, has cautioned that "strict adherence to the Civil Rules is the better practice." *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 895 (1st Cir. 1988). "A canvas of the cases in this circuit regarding service of process demonstrates great deference to the Hague Convention"—the internationally agreed means of service identified by Rule 4(f)(1). *Furukawa Elec. Co. of N. Am. v. Yangtze Optical Fibre and Cable Co.*, 2005 WL 3071244, at *3 (D. Mass. Nov. 16, 2005). Accordingly, this Court has previously required a plaintiff to attempt service under Rule 4(f)(1) before resorting to court-ordered service under Rule 4(f)(3). *See Sionyx, LLC v. Hamamatsu Photonics K.K.*, 2016 WL 4007558, at *8 (D. Mass. July 26, 2016).

In any event, here plaintiff has attempted service under Rule 4(f)(1). Rule 4(f)(1) permits service "by any internationally agreed means of service that is reasonably calculated to give

5

notice," including the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. "Article 2 of the Hague Convention requires all judicial documents in civil matters to be served through a Central Authority." *WhosHere, Inc. v. Orun*, 2014 WL 670817, at *3 (E.D. Va. Feb. 20, 2014); *see* Hague Convention on Service Abroad of Judicial and Extrajudicial Documents art. 2, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163, 1969 WL 97765. Defendants reside in China, where the central authority for service under the Convention is the Ministry of Justice. (Tucker Decl. ¶ 2). *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, 2014 WL 12597628, at *2 (C.D. Cal. Apr. 10, 2014). Plaintiff first attempted service through the Chinese Ministry of Justice in February 2018. (Tucker Decl. ¶ 2). Nearly two years later, and after plaintiff re-submitted its service request to comply with changes in policy at the Ministry, the Ministry has yet to complete service on defendants—or even provide a time estimate for the completion of service. (*Id.* ¶¶ 4, 6).

Accordingly, because plaintiff has attempted service under Rule 4(f)(1), it may seek court-ordered service under Rule 4(f)(3).

### B. Whether Rule 4(f)(3) Permits E-Mail Service on Defendants in China

Rule 4(f)(3) permits courts to order any means of service if it is "not prohibited by international agreement." *Rio Props., Inc.*, 284 F.3d at 1014. In addition, "[e]ven if facially permitted by Rule 4(f)(3), a method of service of process must also comport with constitutional notions of due process." *Id.* at 1016.

#### 1. Whether E-Mail Service Is Prohibited by International Agreement

Generally, whether a means of service is prohibited by international agreement depends on the terms of the Hague Convention. *See, e.g.*, *Rio Props., Inc.*, 284 F.3d at 1015 n.4.[2] "The

---

[2] It may be that other international agreements limit means of service, but none appear relevant here.

'primary innovation' of the Hague Service Convention, set out in Articles 2–7, is that it 'requires each state to establish a central authority to receive requests for service of documents from other countries.'" *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1508 (2017) (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988)). "Submitting a request to a central authority is not, however, the only method of service approved by the Convention." *Id.* The Convention provides several other means of service, such as service by diplomatic and consular agents. *See, e.g.*, Hague Convention, art. 8.

The Convention does not explicitly prohibit e-mail service. It "does not speak in specific terms of service by email, fax, or other means of delivery unknown in the 1960's." *Luxottica Grp. S.p.A. v. Partnerships & Unincorporated Ass'ns Identified on Schedule "A"*, 391 F. Supp. 3d 816, 825 (N.D. Ill. 2019). Still, the question remains "whether the Convention's textual silence on a method of service leaves this court free to authorize service by that method." *Id.*

This is a difficult question on which many courts have disagreed.[3] It appears to have two parts. The first is whether a country's objection to Article 10(a) of the Convention precludes e-mail service. The second is whether (if the answer to the first question is negative) the Convention nevertheless prohibits service by e-mail because it is inconsistent with the methods of service authorized by the convention.

        **a.**      <u>**Whether a Country's Objection to Article 10(a) of the Hague Convention Precludes Service by E-mail**</u>

"Courts generally approach the problem of email service through the prism of Article 10(a)." *Id.* at 826. Article 10(a) states that "[p]rovided the State of destination does not object,

---

[3] *See generally* Michael A. Rosenhouse, Annotation, *Permissibility of Effectuating Service of Process by Email Between Parties to Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, 14 A.L.R. Fed. 3d Art. 8 (West 2019).

7

the present Convention shall not interfere with . . . the freedom to send judicial documents, by postal channels, directly to persons abroad." Hague Convention, art. 10(a). China has objected to that provision. *See Rubie's Costume Co. v. Yiwu Hua Hao Toys Co.*, 2019 WL 6310564, at *2 (W.D. Wash. Nov. 25, 2019).

Courts have split on whether such an objection also prohibits service by e-mail, which is not explicitly listed in Article 10(a). Essentially, the dispute is over whether an objection to Article 10(a)'s reference to service by "postal channels" includes service by e-mail.

Several courts have held that the term "postal channels" does not include e-mail, and therefore Article 10(a) does not specifically refer to e-mail service, and a country's objection to it does not bar e-mail service. *See, e.g.*, *Rubie's Costume Co.*, 2019 WL 6310564, at *3 (collecting cases); *Jackson Lab. v. Nanjing Univ.*, 2018 WL 615667, at *4 (D. Me. Jan. 29, 2018) (same); *Sulzer Mixpac AG v. Medenstar Indus. Co.* 312 F.R.D. 329, 331-32 (S.D.N.Y. 2015) (same).

Other courts have held that the term "postal channels" does include e-mail, and therefore an objection to Article 10(a) must be construed as an objection to e-mail service. *See, e.g.*, *Habas Sinai Ve Tibbi Gazlar Istihsal A.S. v. Int'l Tech. & Knowledge Co.*, 2019 WL 7049504, at *3 (W.D. Pa. Dec. 23, 2019); *Elobied v. Baylock*, 299 F.R.D. 105, 107-08 (E.D. Pa. 2014); *Agha v. Jacobs*, 2008 WL 2051061, at *2 (N.D. Cal. May 13, 2008).

As the split in authority shows, the answer is not necessarily obvious. To start, it is ambiguous whether, on its face, the term "postal channels" includes e-mail. The operative word is "postal," which means "of or relating to mail or post offices." *Postal*, Merriam-Webster Dictionary (Jan. 9, 2020), https://www.merriam-webster.com/dictionary/postal; *see also Post*, *Black's Law Dictionary* (10th ed. 2014) ("post" means "to place in the mail"). Of course, e-mail, which is accessible anywhere with an internet connection, has nothing to do with post offices.

8

But the term e-mail is an abbreviation for "electronic *mail*." *E-mail*, *Black's Law Dictionary* (10th ed. 2014) (emphasis added). Thus, while it would be odd to hear someone say that they "posted" an e-mail, *see id.* at 1354 ("post a *letter*") (emphasis added), e-mail does in some sense relate to traditional mail and so, under a very broad definition, it could arguably qualify as a "postal channel."

However, it is also obvious that "these forms of communication differ in relevant respects." *Sulzer Mixpac*, 312 F.R.D. at 332. In many ways, e-mail is not only different from, but also superior to, traditional mail. It is considerably faster, indeed virtually instantaneous. It is substantially more reliable, particularly compared to international mail. Its "arrival . . . at a destination address may be more readily tracked." *Id.* It allows a recipient to promptly reply to either confirm or deny that the sender has the correct address—as appears to have happened in this case. And e-mail users can often set up filters, which enable them to determine the importance of e-mails they receive more easily and more quickly than is possible with traditional mail.

It is hard to say whether these differences are sufficient to distinguish e-mail from postal channels for the purposes of countries' objections to Article 10(a). On one hand, one can imagine that a country's reasons for objecting to service by "postal channels" may have to do with concerns about traditional mail (such as unreliability and delay) that do not apply to e-mail. On the other, there is a colorable argument that it "elevates form over substance" to conclude that a country that has objected to means of service as traditional as ordinary "postal channels" has nevertheless "implicitly indicated that it would accept service by e-mail . . . ." *Habas Sinai*, 2019 WL 7049504, at *4. In any event, the issue need not be resolved here, as it appears that e-mail service is inconsistent with the authorized means for service set forth in the Convention.

9

### b. Whether Service by E-Mail is Inconsistent with the Methods of Service Provided for by the Hague Convention

Even if China's objection to Article 10(a) does not by itself preclude e-mail service, it is a separate question whether the Hague Convention nonetheless prohibits a means of service that is not explicitly addressed by its terms. *See Luxottica*, 391 F. Supp. 3d at 825.

Two decisions by the Supreme Court indicate that the Convention bars methods of service that, while not explicitly prohibited, are inconsistent with its enumerated methods. In *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504 (2017), the Court held that the Convention "specifies *certain approved methods* of service and 'pre-empts inconsistent methods of service' wherever it applies." *Id.* at 1507 (emphasis added); *see also Schlunk*, 486 U.S. at 698). Similarly, the Court's analysis in *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988) also implies that the Convention's specified methods of service preempt other, inconsistent methods. *See Luxottica*, 391 F. Supp. 3d at 825. In *Schlunk*, the Court held that the Convention's drafters "wanted to eliminate" a method of service called "notification au parquet." 486 U.S. at 703.[4] As evidence, the Court looked at the history of the Convention, but it also found that Articles 15 and 16 are incompatible with notification au parquet, although they do not say so explicitly. *See Schlunk*, 486 U.S. at 703. Like the Court's decision in *Water Splash*, this analysis implies that methods not explicitly addressed by the Convention may nevertheless be prohibited if they are inconsistent with its terms.

The Convention's own structure supports that interpretation. "Article 11 provides that any two states can agree to methods of service not otherwise specified in the Convention." *Id.* at

---

[4] "*Notification au parquet* permits service of process on a foreign defendant by the deposit of documents with a designated local official. Although the official generally is supposed to transmit the documents abroad to the defendant, the statute of limitations [period] begins to run from the time that the official receives the documents, and there allegedly is no sanction for failure to transmit them." *Schlunk*, 486 U.S. at 703.

10

1508. Similarly, "Article 19 clarifies that the Convention does not preempt any internal laws of its signatories that permit service from abroad via methods not otherwise allowed by the Convention." *Id.* What both these articles have in common is that they leave countries free to consent, either unilaterally or together, to means of service that are not specifically authorized by the Convention. These provisions would hardly be necessary if the Convention generally permitted any means of service that are not explicitly authorized or prohibited by its text. *See Luxottica*, 391 F. Supp. at 825. Therefore, their inclusion also suggests that the Convention's authorized means of service preempt any inconsistent methods of service.[5]

E-mail service is one such method. To permit service by e-mail would bypass the means of service set forth in the Convention. *See Luxottica*, 391 F. Supp. 3d at 827. If the Convention left parties free to serve each other by e-mail, it is hard to see why they would ever choose slower, more costly methods. The parties to the Convention could hardly have intended that result; it is unlikely that they desired that the enumerated methods of service they agreed to could be superseded as soon as any new means of service became available. Thus, service by e-mail is inconsistent with the Convention's terms, and is not permitted.

In summary, the Court concludes that e-mail service on defendants is prohibited by the Hague Convention. Even if China's objection to the Convention's authorization of service by "postal channels," as set forth in Article 10(a), does not alone bar service by e-mail, such service is nevertheless prohibited by the Convention because it is inconsistent with the Convention's authorized methods of service. *See id.* Accordingly, the Court concludes that Rule 4(f)(3) does

---

[5] This implies that the Convention's authorized methods of service may be exclusive. Any method of service not explicitly authorized by the Convention is permissible only if it is "consistent" with the Convention's enumerated methods. It is not obvious that there are any such methods. In any event, because service by e-mail is inconsistent with the Convention's terms, the Court need not reach that question.

not permit e-mail service on defendants, and plaintiff's motion will therefore be denied.

## IV.     Conclusion

For the foregoing reasons, Plaintiff's Motion for Service of Process via E-mail Pursuant to Fed. R. Civ. P. 4(f)(3) is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  January 24, 2020